# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

KAYODE OLUFOWOBI,               :
    Plaintiff,                          :
                                             :
v.                                            :    Case No: 3:03cv1161 (PCD)
                                             :
CARDINAL HEALTH 200, INC.,        :
    Defendant.                        :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff brought this action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and Conn. Gen. Stat. §§ 46(a)-60(a)(1). Defendant moved for summary judgment, arguing that Plaintiff could not make out a prima facie case of discrimination under Title VII and could not reasonably meet his burden at trial of showing discrimination by a preponderance of the evidence. For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND[1]

Plaintiff, Kayode "Kingsley" Olufowobi, is an African-American of Nigerian descent. Plaintiff interviewed for the position of "Medi-Vac Sales Specialist" with Defendant, Cardinal Heath, in the summer of 2000. The Medi-Vac Sales Specialist position not only involves selling Cardinal Health equipment, but also involves coordinating and assisting the Surgical Product Sales Representatives in making their sales.[2] The duties of a Specialist include supporting the

---

[1]    Unless otherwise noted, all facts are cited from Defendant's Rule 56(a) Statement and are admitted by Plaintiff.

[2]    Representatives have an individual sales quota, whereas Specialists have a "quota" that is equal to the combined quotas of all of the Representatives that the Specialist coordinates with.

Representatives, sales, being an expert on the equipment, resolving customer concerns, and tracking sales data.

Plaintiff was hired as a Specialist in August 2000 and was in charge of an area covering New England, Eastern New York, New Jersey, and Eastern Pennsylvania.  In order to get the position, Plaintiff first interviewed with his two immediate supervisors, Monica Minore and Lou Mayle, both Regional Managers for Cardinal Health.  Plaintiff then traveled to Massachusetts where he had an interview with Monica Minore, Lou Mayle, and Gregg Brewster, the Cardinal Vice-President in charge of Sales for Surgical Products.

Plaintiff was hired and began working under Ms. Minore and Mr. Mayle.[3]  During this time period it seems that both Plaintiff and Defendant were satisfied with the working relationship.  Plaintiff said that Ms. Minore was a "good manager."  (Pl.'s Dep. 42:6.)  In September of 2001, Plaintiff received his first performance review for the August 2000-June 2001 period.  Plaintiff's final grade on this review indicated that he "consistently meets and at times may exceed requirements."  In her comments included with the review, Ms. Minore declared that Plaintiff's "energy and enthusiasm is contagious!" and that "I have no doubt that Kingsley will number among the best at Allegiance Healthcare."  (2001 Review, Ex. E to Def.'s Mot. for Summ. J. at 5.)

This situation did not continue.  After this evaluation, Plaintiff's supervisor, Ms. Minore, was replaced by Melissa Schmitt.  A few months later, Plaintiff won an award for his excellent sales record.  Plaintiff argues that Ms. Schmitt and he did not get along and that Ms. Schmitt's racially-motivated actions led to his ultimate dismissal.  Plaintiff says that Ms. Schmitt always

---

[3]     Mr. Mayle was soon promoted, leaving Ms. Minore in charge of Plaintiff.

spoke to him in a harsh tone of voice. (Pl.'s Aff. ¶ 33.) Defendant attempts to paint a different picture, arguing that Plaintiff's work product began to slip - perhaps caused by overconfidence after receiving the Award - and that these mistakes plus behavior problems led to his probation and eventual termination.

### A. The Specialist Sales Award and Trip

Ms. Schmitt replaced Ms. Minore in September of 2001. Because the Cardinal Health sales year is July-June, this replacement occurred about a third of the way through Plaintiff's second sales "year." At the end of the second sales year, in June of 2002, Plaintiff had surpassed his sales quota by 8.1%. (2002 Review, Ex. G to Pl.'s Mem in Opp'n to Def.'s Mot. for Summ. J. at 2.) Based on this performance, Plaintiff won the "Medi-Vac Specialist of the Year Award," an award based on meeting the goals of the current year plus improvement over the previous year. Ms. Schmitt agrees that this was a "great year." (2002 Review, Ex. G to Pl.'s Mem. at 7.) Mr. Brewster also sent Plaintiff a congratulatory memo, praising him for his work. (See Memo, Ex. D to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.)

Defendant often awards a reward trip to employees who perform exceptionally well. This "President's Incentive Trip" is based on personal performance, business unit performance, size of the individuals sales force, the sales leader's recommendation, and the business president's recommendation. Only individual performance has a specific numeric goal attached to it, i.e., 105%, which Plaintiff met by selling 108.1%. Plaintiff was told that he could not go on the 2002 trip because the Medi-Vac business unit as a whole did not meet its goal. Plaintiff points out that the Medi-Vac business unit as a whole exceeded its national sales quota by almost 3%. (2002 Review, Ex. G to Pl.'s Mem. at 2.) It is unclear if the business unit, like the individual

3

requirement, had to exceed 105% and it is unclear who made the final decision that Plaintiff

could not go on the trip.

### B. Employee Performance Evaluation

In October 2002, Ms. Schmitt gave Plaintiff his review for the 2001-2002 sales year.

Cardinal Health's employee evaluations work as follows:  The manager fills out an employee

evaluation by listing all of the employee sales statistics as well as the regional and national

statistics and grading the employee in a number of "core competency" areas.  At the end of the

evaluation, goals are set out for the employee's improvement.  The employee fills out one of

these evaluations as a self-evaluation, and the manager and employee then discuss the two

evaluations.  (See 2001 Review, Ex. E to Def.'s Mot.; 2001 Self-Review, Ex. F to Def.'s Mot.

for Summ. J.)

Plaintiff argues that his "negative" October 2002 review from Ms. Schmitt shows her

cynical attitude towards him after his great sales year.  The October 2002 review was not as good

as the previous review conducted by Ms. Minore, but the overall conclusion was the same.

Plaintiff was rated as "meeting Cardinal Health's standards," the same grade he received the year

before.  When Plaintiff's "specific competencies" were scored by Ms. Minore a year before, he

was given a rating of "needs improvement" in three categories.  (See 2001 Review, Ex. E to

Def.'s Mot. at 3-5.)  When Ms. Schmitt began the October 2002 meeting, she had a rating of

"needs improvement" in five categories.  Ms. Schmitt said that she had lower ratings for Plaintiff

because Sales Representatives had complained about him.[4]  Ms. Schmitt told Plaintiff that he

---

[4]       At her deposition, Ms. Schmitt testified that the Sales Representatives said, "[Plaintiff] wasn't
available for product evaluations or that he canceled appointments with them.  They scheduled
trials and [Plaintiff] didn't show up or he showed up late." (Schmitt Dep. 101:10-19, Oct. 6,

4

worked in his "own little world" without coordinating with others. (Pl.'s Aff. ¶ 4.)  Plaintiff says

that he had problems with only one Sales Representatives, who would schedule appointments

without properly consulting him.  (Pl.'s Dep. 91:3-13.)  Plaintiff and Ms. Schmitt argued over the

review ratings, and Ms. Schmitt ultimately upgraded two of the five ratings to "meets

expectations."  Ms. Schmitt also claims that during this meeting, Plaintiff told her he "wasn't

working very hard" since he had won the award and not been allowed to go on the trip.  (Schmitt

Dep. 19:13-24.)  Ms. Schmitt and Mr. Brewster testified, however, that at the end of October

2002 they both thought that Plaintiff was doing well and was progressing in his job.

Plaintiff continued to be upset about his evaluation and argues that it did not reflect the

award and praise he had recently received.  Plaintiff views Ms. Schmitt's "low" evaluation of

him as evidence of her discrimination.  Plaintiff, on his personal evaluation, rated himself higher

in several of the core competency areas, but with the same overall score of "meeting Cardinal's

expectations."  (See 2002 Self-Review, Ex. L to Def.'s Mot. for Summ. J.)

**C. The Performance Improvement Plan**

Cardinal Health uses Performance Improvement Plans ("PIP") as a remedial measure.

The plans are designed to correct an employee's deficient performance.  The PIP seems geared

towards improving sales, and, as such, it is agreed that an employee who does not make quota for

two consecutive years is automatically put on a PIP.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for

Summ. J. at 36.)  A PIP, also referred to as a "final written warning," is a temporary plan,

although failure to meet its requirements can lead to termination.

Early in 2003, Ms. Schmitt reported several problems with Plaintiff.  In January, she

_____

2005.)

traveled with Plaintiff to Yale New Haven Hospital and was troubled by his "lack of teamwork and customer focus." According to Plaintiff's testimony, he and Ms. Schmitt argued about his performance while in the Yale Cafeteria. (Pl.'s Dep. 79:1-6, 145:24-147:16.)

On March 5, 2003, Ms. Schmitt again traveled with Plaintiff to a different hospital. At that hospital where one of the customers, Mr. Cannone, complained to Ms. Schmitt that he had asked Plaintiff for information in January and that Plaintiff never responded. Mr. Cannone then said he had called Plaintiff and left a message requesting the information a second time, but Plaintiff again did not respond. Plaintiff explains in a post-deposition affidavit that he was not working with Mr. Cannone, but with a different hospital representative. (Pl.'s Aff. ¶ 10.) Plaintiff explains that he had not received Mr. Cannone's phone message and had never given Mr. Cannone his contact information. Neither side has a statement from the customer describing the actual relationship, however, Plaintiff testified that he was present when the customer complained to Ms. Schmitt. (Pl's Dep. 147:2-148:7.)

Also on March 5, Ms. Schmitt and Plaintiff discussed an earlier event. For one week at the end of February, Plaintiff was scheduled to attend a product demonstration at St. Barnabas Hospital. Plaintiff knew that no other Cardinal Health representative would be there. On February 24, however, Plaintiff failed to attend the demonstration. Plaintiff contends that it was snowing that morning, that he called the hospital to let them know he would not be coming in, and that the hospital agreed that he did not need to come in because they were short on staff due to the weather. (See Cell Phone Records, Ex. L to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.; Pl.'s Aff. ¶ 15.) Ms. Schmitt, however, claims that the customer complained about Plaintiff's absence and that she called Plaintiff and asked why he was not at the demonstration.

6

Plaintiff insisted that he had been there, however, when Plaintiff and Ms. Schmitt were together on March 5, it became clear to Ms. Schmitt that Plaintiff had not been there on the exact day of February 24. In his deposition, Plaintiff explained that he thought Ms. Schmitt was asking why he had not been in attendance the entire week. (Pl.'s Dep. 158:4-16.) Because of the alleged miscommunication over his absence, Ms. Schmitt accused Plaintiff of lying to her. Ms. Schmitt was obviously angry over the incident, describing it as "the big trigger" to Plaintiff's eventual termination. (Schmitt Dep. at 121:7-9.)

Ms. Schmitt testified that after the March 5 trip, she talked to Ann Toth of human resources and Mr. Brewster about what to do with Plaintiff, at which point they decided to place Plaintiff on a PIP. (Schmitt Dep. at 46:22-47:3.) Pursuant to the PIP, Plaintiff was required to meet with certain customers, present certain reports to Ms. Schmitt, convert equipment at Valley Hospital, and do several other related tasks. (See PIP, Ex. M to Def.'s Mot. for Summ. J.) It is conceded that Plaintiff failed to meet all of the requirements of the PIP, however, Plaintiff claims that the PIP was designed for him to fail and imposed onerous burdens. (Pl.'s Aff. ¶ 19.) For example, Plaintiff argues that he could not complete required monthly reports without first getting sales data from Ms. Schmitt's office. Since, according to Plaintiff, Ms. Schmitt's office did not provide the data, he was unable to meet the requirements.[5] Plaintiff was also required to meet in person with five customers each week from a certain list of valued customers. Plaintiff argues, however, that since his sales territory reached from Maine to New Jersey and since customers only meet when they are available, this requirement was unrealistic.

---

[5]    The Court notes Defendant's objection that this assertion, contained in an affidavit prepared as a response to Defendant's summary judgment motion, may be contrary to what the Plaintiff claimed at his deposition.

After being placed on the PIP, Plaintiff was confused and upset, as evidenced by an email he sent to several mangers asking "WHAT WENT WRONG?"  (Complaint Email, Ex. N to Def.'s Mot. for Summ. J.)  Mr. Brewster received the email from Plaintiff.  In late March, Mr. Brewster had several conversations with Plaintiff about the PIP and his performance during which Plaintiff complained to Mr. Brewster about his treatment.  Plaintiff also told Mr. Brewster that he intended to sue for discrimination if he was fired.

On April 24, 2003, Plaintiff met with Ms. Schmitt to discuss the PIP requirements.  Ms. Schmitt noted that Plaintiff was running behind on his requirements and was in danger of being terminated.  Finally, on May 16, 2003, Ms. Schmitt, Mr. Brewster, and Plaintiff had a telephone conversation in which Plaintiff was terminated for failing to meet the terms of the PIP.

**D. Evidence of Discrimination**

Plaintiff has pointed to several facts not previously mentioned that are designed to show that Ms. Schmitt discriminated against him.  Ms. Schmitt was relatively new in her position, but she had placed only one other employee, a black male named Jerome Williams, on a PIP.  (See Schmitt Dep. 53:10-17.)  Mr. Williams had not met quota for two years, which automatically results in being placed on a PIP.  Ms. Schmitt testified that Ms. Minore recommended to her that Mr. Williams be placed on a PIP when Ms. Schmitt took over Ms. Minore's position.  (Schmitt Dep. 54:22-24.)  Since the suit was filed, Ms Schmitt has also placed Anthony Piscitelli, Cynthia Johnson, Dan Check, and David Testa - all white employees - on PIPs.

Plaintiff also points out he is the only person that has been placed on a PIP by Ms. Schmitt for a reason other than failing to make quota.  Defendant admits that this is true, but argues that PIPs are not exclusively used for sales deficiencies.  Defendant says that Plaintiff's

8

problems with customer service and alleged lies to Ms. Schmitt are sufficient reasons to place him on a PIP.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact as a matter of law." Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

This Court considers any fact material if it "might affect the outcome of the suit under governing law" and an issue is disputed or "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d. Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 255, and the court should draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cr. 1995) (citations omitted).  Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as these determinations are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "When reasonable persons

9

applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury." Sologub v. City of N.Y., 202 F.3d 175, 178 (2d Cir. 2000).

Courts should take caution before exercising the power of summary judgment in fact-intensive discrimination cases, especially when discriminatory intent and state of mind are in dispute. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). However,

> it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . The salutary purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no less to discrimination cases that to . . . other areas of litigation.

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("Trial courts should not treat discrimination differently from other ultimate questions of fact.")

## III.  DISCUSSION[6]

Plaintiff alleges, in his Complaint, that Defendant discriminated against him because of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and Conn. Gen. Stat. §§ 46(a)-60(a)(1).  Claims made under Title VII are analyzed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, the burden is first on Plaintiff to first make out a primae facie case of discrimination.  Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001).  Plaintiff's burden at this stage is minimal.  Id.  Once Plaintiff makes out a

---

[6]   Plaintiff has sued under Title VII and Connecticut State Law.  The analysis of Connecticut State Law discrimination claims is the same analysis that is performed under Title VII.  Sample v. Wal-Mart Stores, Inc., 273 F. Supp. 2d 185, 188 (D. Conn. 2003) (citing Sorrento v. All Seasons Services, Inc., 245 Conn. 756, 767, 717 A.2d 150 (1998)).  Therefore, the discussion below applies equally to both claims.

prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for taking the adverse action.  Id.  If Defendant articulates a legitimate reason, the presumption of discrimination disappears, and the burden shifts to Plaintiff to prove, by a preponderance of the evidence, that Defendant's asserted reasons are pretextual and that discrimination was the actual motivating factor.  Id.; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143.

**A. Plaintiff's Prima Facie Case**

In order to make out his prima facie case, Plaintiff must show that: (1) he is a member of a protected class, (2) he is qualified for the position, (3) he suffered an adverse employment action, and (4) that the circumstances surrounding the action give rise to an inference of discrimination.  McDonnell Douglas, 411 U.S. at 802.  In the instant case, Defendant does not contest that Plaintiff has satisfied prongs one, three, and four of this burden.  Accordingly, only the second prong will be discussed here.

Defendant argues that Plaintiff was not qualified for his position, asserting that because the PIP was one of Plaintiff's job requirements, his failure to complete the PIP requirements demonstrates that he was unqualified for the job.  In order to be considered "qualified for the position," Plaintiff must demonstrate only a basic eligibility for the position.  Slattery, 248 F.3d at 91-92.  Plaintiff must also prove that he met Defendant's criteria for job performance, Thornley, 104 F.3d at 29, but this should not be interpreted in such a way as to shift onto Plaintiff the obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a

legitimate, non-discriminatory basis for its decision.  <u>Slattery</u>, 248 F.3d at 92.[7]   It is not

appropriate to consider Defendant's evidence in determining whether Plaintiff has met his prima

facie burden.  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 41-42 (2d Cir. 2000).

       In the instant case, Plaintiff was an employee of Defendant for almost three years.

Plaintiff was not in a probationary hiring period.  Plaintiff performed well during his first two

years, with his first annual review stating that,  "I have no doubt that Kingsley will number

among the best at Allegiance Healthcare."  During Plaintiff's second sales year, he won the

Medi-Vac Specialist of the Year award, indicating that his sales were above quota.  Defendant's

argument that Plaintiff was "unqualified" does not distinguish between the reasons for firing

Plaintiff and Plaintiff's qualifications for, i.e., ability to perform, the job.  Almost any

deficiencies in performance could also be evidence that the employee is "unqualified" for, i.e.,

lacking a basic eligibility for, the job.  Unless the underlying job requirements change, it is

---

[7]    Defendant argues that Plaintiff was not showing "satisfactory job performance at the time of discharge" as required by <u>Thornley v. Penton Publ'g, Inc.</u>, 104 F.3d 26 (2d Cir. 1997).  Plaintiff, however, points to the more recent decision of <u>Slattery v. Swiss Reins. Am. Corp.</u>, 248 F.3d 87 (2d Cir. 2001), which held that a plaintiff must only show basic eligibility for the position, rather than making the greater showing that he satisfies the employer.  <u>Id.</u>, at 91.  As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualifications is not difficult to draw.  <u>Id.</u>, at 91-92.

    <u>Thornley</u> provides that failure to meet an employer's honestly-held standards shows that a plaintiff is unqualified for the job and can not establish a prima facie case.  <u>Thornley</u>, 104 F.3d at 29.  This can be true even after the employee has been hired, as in cases where an employee was hired on a probationary basis and then failed to qualify for the job.  <u>See</u>, <u>e.g.</u> <u>Gregory v. Daly</u>, 243 F.3d 687, 697 n.7 (2d Cir. 2001); O'Neal v. Nicholson, No. 04 CIV. 7724 (DLC), 2006 U.S. Dist. LEXIS 14265, at *9 (S.D.N.Y. Mar. 31, 2006).  That is not the situation at issue here.  <u>Slattery</u>, instructs courts that "[T]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."  <u>Slattery</u>, 248 F.3d at 92.  Therefore, the fact that an employer fired an employee for sub-standard performance does not necessarily mean that the employee was "unqualified" for the position.  <u>See Joseph v. Manhattan and Bronx Surface Trans. Operating Auth.</u>, 96 Civ. 9015 (DAB), 2004 U.S. Dist. LEXIS 17021, *33-34 (S.D.N.Y. Aug. 25, 2004) (applying Slattery and finding that an employee who was commended on his fine job performance but later disciplined and fired had met his prima facie case).

difficult to argue that an employee who at one point was performing admirably is somehow "unqualified" for the position under the standard articulated in <u>Slattery</u>.  Therefore, Plaintiff, by his performance, has established that he is qualified for the position.  The other three prongs not being contested, Plaintiff has met the *de minimus* burden of proving a prima facie case.

### B. Defendant's Legitimate, Nondiscriminatory Reasons for Termination

Under the <u>McDonnell Douglas</u> framework, the burden next shifts to Defendant to provide a legitimate, non-discriminatory reason as to why Plaintiff was terminated.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742 (1993); <u>Windham v. Time Warner, Inc.</u>, 275 F.3d 179, 187 (2d Cir. 2001).   Defendant argues that Plaintiff was terminated because he ignored customers, lied to supervisors, and failed to complete the requirements of the PIP.  One of Plaintiff's customers complained to Ms. Schmitt that Plaintiff had not brought the information he requested even though he had made several requests.  Ms. Schmitt explained how Plaintiff had "lied to her" about being present on February 24 at a required product demonstration.  These factors purportedly motivated Defendant to put Plaintiff on a PIP, whereby he was warned that he would be terminated if he did not comply with its requirements.  When Plaintiff did not meet the PIP requirements, he was fired.  Lying to supervisors, ignoring customers, and failing to complete the requirements of an established performance improvement plan, if proven, could constitute legitimate, non-discriminatory reasons for termination.  Therefore, Defendant has met its burden of producing a legitimate reason.

### C. Evidence that Defendant's Proffered Reasons are Pretext for Discrimination and that Discrimination was the Actual Motivating Reason

At this point, the burden returns to Plaintiff, who must show, by a preponderance of the

evidence, that Defendant's proffered reasons for terminating him are pretext and that discrimination was the actual motivating reason.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000);  Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001).

Plaintiff admits that he has no "direct" evidence of discrimination, but claims that he can prove discrimination indirectly.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 10.)  Direct evidence of discrimination is not necessary.  See Rosen v. Thornburgh, 928 F.2d. 528, 533 (2d Cir. 1991);  Grey v. City of Norwalk Board of Education, 304 F. Supp. 2d 314, 325 (D. Conn. 2004).  It is difficult to prove an employer's actual motivations, and employers are unlikely to leave a "smoking gun."  See Rosen, 928 F.2d at 533.  An extra measure of caution is merited in granting summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent is only inferable from circumstantial evidence.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).

1.  Plaintiff's Indirect Evidence of Discrimination

Plaintiff proffers indirect evidence of black employees being treated differently to show that black employees were discriminated against.  For example, soon after Ms. Schmitt arrived, she placed a black employee, Jerome Williams, on a PIP for failure to meet quota.  A few months later, Ms. Schmitt placed Plaintiff on a PIP.  Plaintiff points out that he is the only person that has been placed on a PIP by Ms. Schmitt for a reason other than failing to make quota.  Moreover, Plaintiff argues that Ms. Schmitt's "negative" evaluation of him so soon after his award is evidence that he did not deserve to be placed on a PIP.

Defendant admits these facts, but notes that Mr. Williams had not met his sales quota for two years and that a salesman who has not met quota for two years is automatically placed on a

PIP.  Other white employees have been placed on PIPs by Ms. Schmitt for failure to meet quota

for two years, but none before this lawsuit was filed.  Defendant asserts that PIPs are not

exclusively used for sales deficiencies, even if Plaintiff was the only person placed on a PIP by

Ms. Schmitt on that basis, and contends that the PIP was an appropriate response to Plaintiff's

alleged problems.  Defendant also argues that Plaintiff's "negative" review was similar to the

previous year's review and played a small role in the decision to place Plaintiff on a PIP,

asserting instead that Plaintiff's alleged lies were the motivating factor.

> ### 2. Plaintiff's Evidence that Defendant's Proffered Reasons are Pretext for Discrimination

Plaintiff also argues, pursuant to Reeves v. Sanderson Plumbing Products, that he doesn't

have to provide additional evidence of discrimination as long as he can rebut Defendant's

proffered reasons for the termination and show that they are a pretext for discrimination:

> Proof that the defendant's explanation is unworthy of credence is simply one form
> of circumstantial evidence that is probative of intentional discrimination, and it
> may be quite persuasive. . . . In appropriate circumstances, the trier of fact can
> reasonably infer from the falsity of the explanation that the employer is
> dissembling to cover up a discriminatory purpose. Such an inference is consistent
> with the general principle of evidence law that the factfinder is entitled to consider
> a party's dishonesty about a material fact as "affirmative evidence of guilt."

Reeves, 530 U.S. at 146-147 (emphasis in original); see also St. Mary's Honor Center v. Hicks,

509 U.S. 502, 511 (rejection of the defendant's proffered reasons will permit the trier of fact to

infer the ultimate fact of intentional discrimination).  Plaintiff argues that he can show that all of

Defendant's proffered reasons are false and that a jury should be permitted to find, based on their

falsity, that Defendant's reasons are a pretext for a discriminatory purpose.[8]  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 17-19.)

A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  Reeves, 530 U.S. at 148.  Since Plaintiff has established a prima facie case, he can survive summary judgment by showing that Defendant's proffered reasons are sufficiently disputed to create a material issue of fact as to their falsity.  But cf. Zimmerman v. Assoccs. First Capitol Corp., 251 F.3d 376, 381-82 (2d Cir. 2001) (stating that a prima facie case plus evidence of pretext doesn't suffice to permit a finding of discrimination unless the "entire record" supports a reasonable finding of discrimination)[9]; James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000); Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000).

*a. Adverse Employment Actions*

Plaintiff challenges three adverse employment actions, namely (1) placing Plaintiff on a PIP, (2) setting the terms of the PIP, and (3) firing Plaintiff for not completing the PIP.  Plaintiff can prove discrimination by showing that (a) a non-African American employee who acted similarly was not placed on a PIP, (b) a non-African American employee had easier requirements

---

[8]  Defendant argues that Reeves involved a judgment as a matter of law and is not applicable to this motion, but the reasoning of Reeves does not depend on the concept of judgment as a matter of law.  As the above excerpt shows, Reeves is a statement about what evidence is sufficient to prove discrimination.  If evidence prevents a judge from ruling for Defendant as a matter of law after the trial, that same evidence prevents a judge from granting summary judgment before the trial.  See, e.g., Windham v. Time Warner, Inc., 275 F.3d 179, 187-88 (2d Cir. 2001) (discussing how a plaintiff can use Reeves to survive summary judgment).

[9]  Zimmerman was also a judgment as a matter of law, but courts have applied its reasoning to summary judgment motions.  See, e.g., Brown v. Parkchester S. Condos., Inc., No. 00 Civ. 7235 (FM), 2006 U.S. Dist. LEXIS 15746, at *28 (S.D.N.Y. Mar. 31, 2006).

than those set in Plaintiff's PIP, (c) a non-African American employee who completed the same amount of the PIP as Plaintiff was not fired, or (d) all of Defendant's proffered reasons for taking the adverse actions are pretextual.  See Reeves, 530 U.S. at 148; Moore v. Capitol Reg. Workforce Dev. Bd., 359 F. Supp. 2d 133, 137 (D. Conn. 2005) (refusing to draw disparate treatment inference where "plaintiff has not shown that . . . other administrative assistants had a similar record of complaints made against them or that they had demonstrated . . . poor work performance"); Bass v. NYNEX, No. 02 CIV. 5171 (DLC), 2004 WL 1941088, at *7 (S.D.N.Y. Nov. 23, 2004) (rejecting plaintiff's argument that he was unfairly placed on a PIP because he provided no evidence "that he was treated differently"); Cockfield v. United Technologies Corp., 289 F. Supp. 2d 126, 131 (D. Conn. 2003) (denying defendant's motion for summary judgment because similarly situated white employees were not punished for misconduct).

### b.  Completing the PIP

As previously noted, Plaintiff did not complete all of the requirements of the PIP. Plaintiff asserts only that he completed the "majority" of the PIP requirements, (Pl.'s Rule 56(a) Stmnt. ¶ 13), and that he made "every reasonable effort" to complete the PIP.  (Pl.'s Mem in Opp'n to Def.'s Mot. for Summ. J. at 25.)  The argument that Plaintiff made every reasonable effort is better understood as an argument that the requirements of the PIP were unreasonable and discriminatory.  Plaintiff does not argue that a white employee that did not complete the PIP requirements would not have been terminated.

### c.  The Requirements of the PIP

Plaintiff could also argue that the requirements set by Ms. Schmitt for the PIP were discriminatory.  In other words, it could be argued that Ms. Schmitt set more difficult goals for

17

Plaintiff because he was black and she wanted him fired.  Plaintiff, however, admits in his deposition that the PIP was "doable."  (Pl.'s Dep. 189:7-9.)[10]  In a post-deposition affidavit Plaintiff clarifies that he thought the PIP was "unreasonable."  (Olufowobi Aff. ¶19.)[11]

In either case, it doesn't matter if the PIP was reasonable or not.  Plaintiff must argue and raise a question of fact as to whether his PIP was made difficult because of his race.  Plaintiff has not done this.  Ms. Schmitt has placed several other employees on PIPs.  No other employee's PIP requirements are discussed or even mentioned.  Giving Plaintiff the extreme benefit of the doubt, it could very well be true that Cardinal uses PIPs as instruments to facilitate terminating an employee by making the requirements difficult, but this is still not evidence that Plaintiff was treated differently nor that Plaintiff's requirements resulted from consideration of his race.  Plaintiff can argue that it was discriminatory to place him on a difficult PIP, but this argument is addressed in the following section.

### d.  Placing Plaintiff on the PIP

Plaintiff must raise a genuine issue of fact as to whether his placement on the PIP was due to his race.  Plaintiff attempts to do this by offering indirect evidence and by challenging Defendant's purported reasons for placing Plaintiff on the PIP.

### i.  Indirect Evidence

By showing that Ms. Schmitt placed two black employees on PIPs and that Plaintiff was

---

[10]    On page 155 of his deposition, Plaintiff says only that he told Ms. Schmitt the PIP was "doable," but on page 189, he seems to confirm that he actually thought the PIP was "doable."

[11]    A post-deposition affidavit is suspect and can be disregarded when the affidavit is prepared for summary judgment and contradicts deposition testimony, see Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987); however, it is possible that this change is just a "clarification" and not a "correction."

the only person put on a PIP for a reason other than low sales, Plaintiff attempts to show that Ms. Schmitt treated black employees in a discriminatory manner.  In other words, Plaintiff argues that black employees were disciplined in situations where white employees would not be.

With respect to Jerome Williams, however, Defendant explains - and Plaintiff does not offer any evidence in dispute - that Mr. Williams had not met his quota for two years.  It is agreed that any employee who does not meet quota for two years is automatically placed on a PIP.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 36-37.)  Defendant has shown that several white employees were placed on a PIP by Ms. Schmitt after failing to meet quota for two years.  Plaintiff does not offer any evidence indicating that white employees who had not met quota for two years were not placed on a PIP.  At best, Plaintiff argues that there were white employees who did not perform well on their annual reviews who were not placed on PIPs.

Plaintiff is unable to demonstrate that he was placed on the PIP because of his race. Plaintiff focuses strongly on the fact that he had a great sales year the year before and was highly praised by the company.  Plaintiff's sales performance, however, was not the motivating reason for placing Plaintiff on a PIP.  Plaintiff recognizes "three purported reasons for placing Plaintiff on a PIP," including (1) failure to appear at work on February 24, 2003, (2) lying about being at work on February 24, 2003, and (3) failure to meet the needs of customers who were allegedly complaining about him. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 16.)

Plaintiff also argues that the fact that no white employees were placed on PIPs for non-sales reasons shows that he was treated differently.  This assumes that there were white employees whose conduct was comparable to Plaintiff's.  This does not create a genuine issue of material fact because Plaintiff does not show that any white employees were accused of not

showing up to work, lying, and/or conducting themselves remotely like the conduct attributed to Plaintiff.  Plaintiff is the only person shown to have been put on a PIP for non-sales reasons, but Defendant argues that Plaintiff is the only person who had performance problems warranting the PIP and that Plaintiff has offered no evidence to the contrary.  Plaintiff is not required to show that other white employees had the exact same problems as he did and were not disciplined, but Plaintiff has not identified any similarly situated white employees with similar problems who were not put on a PIP.  Plaintiff points to three white employees who did poorly on their 2003 annual evaluations and were not placed on PIPs,[12] but Plaintiff fails to show or even argue that doing poorly on one annual review is similar to his conduct and warrants similar treatment.  Plaintiff does not argue that a PIP cannot be used for other reasons, nor does Plaintiff argue that a white employee who acted as he did would not have been placed on a PIP.  Plaintiff simply makes the conclusory allegation that he was placed on a PIP because of his race.

        ii.  Evidence that Defendant's Proffered Reasons are Pretext for Discrimination

Even though Plaintiff's indirect evidence may not be sufficient to convince a reasonable factfinder that Plaintiff suffered discrimination, he can still carry his burden by presenting evidence which shows that Defendant's asserted reasons for placing him on the PIP are pretextual.

Plaintiff argues that it was unfair for Defendant to place him on the PIP.  One of the reasons for the PIP was that a customer, Mr. Cannone, complained to Ms. Schmitt in front of

---

[12] "In fact, even though [Ms. Schmitt] gave the plaintiff a rating of "meets expectations" seven months before placing him on a PIP, Schmitt did not place three white employees who reported to her in Fiscal Year 2003 on a PIP, even though she rated each of them as "below expectations." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1.)

Plaintiff that he could not get in touch with Plaintiff.  (Pl.'s Dep 148:3-7.)  Plaintiff responds to

Defendant's arguments regarding Mr. Cannone's complaints to his boss by arguing that:

> [D]uring the first five months of the project, [Plaintiff] never met with, spoke to,
> or corresponded directly with Cannone because he dealt directly with Kelle
> Laws, an independent Cardinal contractor, on that project.  Laws, through an e-
> mail, identified Cannone as an alternative contact person.  Defendant provides no
> objective evidence beyond its self-serving declarations that the customer was
> unhappy.  Finally, [Plaintiff] provided the drain codes to Cannone's sales
> representative - Benjamin Miller, the person with whom he was working in
> addition to Laws - in February 2003.  The same e-mail shows that [Plaintiff] sent
> the relevant evidence directly to Cannone 20 days later."

(Pl.'s Mem in Opp'n to Def.'s Mtn. for S.J. at 21.)  This excerpt, although disputing the

underlying reasons for Mr. Cannone to be upset, does not dispute that he was in fact upset.[13]

Defendant argues that Plaintiff was put on a PIP in part because his customer was upset.

Even if the customer should not have been upset, this is not sufficient to show that Defendant's

claim that it disciplined Plaintiff because the customer was upset is pretext.  A showing that

customers had no real cause to complain does not mean that they did not complain or that

Defendant's reliance on the complaints as justification for the disciplinary actions is pretextual.

Plaintiff cannot meet his burden by showing that he did not deserve the PIP; he must show that

Defendant's reasons for placing Plaintiff on a PIP are pretext. Plaintiff agrees that the customer

complained; it occurred when he was present.  (Pl.'s Dep. 148:3-17.)  Plaintiff does not create a

genuine issue of material fact as to whether Defendant falsely claimed that Plaintiff was

disciplined because of customer dissatisfaction.

Defendant has also argued that Plaintiff was placed on a PIP due to his alleged lie about

---

[13]    The excerpt says there is "no objective evidence" showing that Mr. Cannone communicated his
anger to Defendant, but the evidence shows that Mr. Cannone complained to Ms. Schmitt right in
front of Plaintiff.  (Pl.'s Dep. 148:3-17.)

being present at the required February 24 product demonstration.  Defendant argues that Ms.

Schmitt's feeling that she had been lied to was one of the biggest reasons for placing Plaintiff on

the PIP.  Plaintiff argues, however, that this was simply a miscommunication, testifying at his

deposition that:

> A.  Ms. Schmitt never asked me a direct question about -- I guess if she asked me
> [about it], she probably asked -- she would ask about the progress of the trial
> at St. Barnabus, but we never specifically put a date to it.  If she's going to
> group the dates together and come back and ask me almost a month later on
> that, did I mention I was at the account when I wasn't, that's, you know, a
> misunderstanding on her part.  I never told her I wasn't there on February
> 24th.  The week of the 24th is when I mentioned I wasn't there.

(Pl.'s Dep. at 158:4-16.)  The key fact, however, is that Ms. Schmitt *thought* Plaintiff was lying

to her and disciplined him for it.  Plaintiff does not argue that her belief was not genuine;

Plaintiff only argues that he did not actually lie.  Plaintiff does not say that he carefully explained

his conduct.  Nor does he contend that Ms. Schmitt ever recognized a misunderstanding of what

he said.  Ms. Schmitt discovered the alleged lie on Friday, March 5.  The next week Ms. Schmitt

talked to Ms. Toth and Mr. Brewster about what should be done.  Plaintiff was placed on the PIP

on March 11.  This time-line is further evidence that Ms. Schmitt placed Plaintiff on a PIP as a

direct response to his alleged lying.  Plaintiff's explanation of the incident does not show that

Ms. Schmitt's reason for her action is pretextual.

       This same analysis applies to Defendant's third reason, i.e., Plaintiff's failure to show up

as required on February 24, which later caused the "miscommunication."  Plaintiff admits that he

was required to be present on that date and that he was the only Cardinal employee scheduled,

but argues that he called the hospital and said he would not be there due to the weather.

Defendant argues that Plaintiff failed to show up for work when required, that the customer complained, and that this was another reason to place Plaintiff on the PIP.  The fact that Plaintiff might have a reasonable excuse to vitiate the customer's complaint does not show that the customer did not complain and that Defendant's reliance thereon is pretextual.

iii.  Conclusion

Although the picture presented by Defendant of Plaintiff's poor performance is not consistent with his initial strong performance, the events alleged by Defendant and conceded to by Plaintiff - even if explained by Plaintiff now - unquestionably did occur.  Plaintiff has not created a genuine dispute over whether the reasons given by Defendant for his termination are legitimate or pretextual or that Defendant's actual motivating reason was discrimination. Plaintiff has also not offered credible indirect evidence of discrimination.   Defendant did discipline one other black employee, but Plaintiff has no evidence, other than his own conclusory allegations, that this action was discriminatory.  Plaintiff has also not provided evidence sufficient to show that he was treated differently than another similarly situated employee. Accordingly, summary judgment is appropriate.

**D. Defendant's Alternative Arguments**

In addition to the arguments already discussed, Defendant argues that since Mr. Brewster hired and fired Plaintiff, the "same-actor inference" should resolve any discrepancies against Plaintiff.  See Carlton v. Mystic Trans., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (explaining the theory that when one actor hires a person already within the protected class, and then the same actor later fires that same protected employee, it is difficult to impute to her an invidious motivation.)  This argument, however, overlooks Plaintiff's claim that Ms. Schmitt was the

23

driving force behind his termination.  The step-wise interview process also indicates that Ms.

Minore and Mr. Mayle had a significant role in the decision to hire Plaintiff, but that Mr.

Brewster may have had the final word.[14]  (Pl.'s Dep. 12:2-24:4, Oct. 11, 2005.)

Defendant also argues that Plaintiff's failure to mention racial discrimination in his

complaint letter after being placed on the PIP is evidence that discrimination was lacking.

Plaintiff did, however, raise discrimination in a phone conversation with Mr. Brewster soon

thereafter.  The fact that he failed to mention discrimination in his complaint letter is not

dispositive.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, May  25 , 2006.

/s/

Peter C. Dorsey, U.S. District Judge
United States District Court

---

[14]       It is not clear that the "same-actor inference" should apply when Plaintiff was hired or fired by committee.

24